UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————

CRANE SECURITY TECHNOLOGIES,  )
INC. AND VISUAL PHYSICS, LLC,  )
                               )
        Plaintiffs/Defendants- in  )
        Counterclaim,          )
                               )
                               )
v.                             )        Civil Action No. 14-12428-LTS
                               )
ROLLING OPTICS, AB             )
                               )
        Defendant /Plaintiff-in  )
        Counterclaim           )

————————————————————

ORDER ON ROLLING OPTICS AB'S
MOTION TO COMPEL PRODUCTION
OF DOCUMENTS IMPROPERLY WITHHELD (#192).

February 3, 2017

KELLEY, U.S.M.J.

I. Introduction

        Crane Security Technologies, Inc., is the exclusive licensee of the five U.S. patents at

issue in this case.[1]  The patents "relate generally to optical systems that project synthetic images

that 'move' and that include image icons formed as voids or recesses." #79 ¶ 1.  Crane "is the

exclusive supplier of banknote paper for United States currency and also supplies other

counterfeit-deterrent banknote papers and security devices used around the world."  Id. ¶ 2.

————————————————

        [1]Crane Security is part of a family of companies that includes its parent, Crane & Co.,
Inc.  #79 ¶ 2.   Visual Physics, LLC, a wholly-owned subsidiary of Crane, is the owner of the
patents.  Id. ¶ 3.  In this Order the plaintiffs generally will be referred to as "Crane."

1

Crane asserts that an "optical system" that is made using the patents - which, for example, on a $100 bill appears as a small strip of metallic-blue paper with images in it that appear to move around when the bill is moved - is difficult to copy, and so is "extremely useful as [an] anti-counterfeiting feature[] on currency." *Id.* ¶ 1.

Defendant Rolling Optics (RO) describes itself as a nanotechnology company that "makes and sells innovative 3D micro-optic foils. Typical applications for these foils are for use on product labels or packaging, to enhance or create brand impact or to assure the genuineness of a branded product." #13 ¶ 3. Crane claims that the foils that RO makes and sells, "intended for use on security labels and stickers for certain consumer goods such as fashionable footwear, cognac, wine, champagne, and business cards," infringe its patents. #79 ¶ 14.

Plaintiffs seek a declaration that Visual Physics is the owner and Crane is the exclusive licensee of the five patents, that each patent is valid and enforceable, and that RO is infringing on each of the patents. They also seek monetary and injunctive relief. *Id.* ¶¶ 53-59.

RO initially counterclaimed for, among other things, declaratory judgment of invalidity and non-infringement of the five patents. #87.[2] In August 2016 Judge Sorokin allowed RO's motion to add an inequitable conduct counterclaim. #245. In short, RO claims that the patents are invalid, because when applying for the patents, Crane (together with the company from which Crane purchased the patents, Nanoventions (NV)), withheld information from the Patent and Trademark Office that would have established that the inventors had violated the "on-sale

---

[2]Many of the pleadings are filed under seal. After initial citations to both redacted and unredacted documents, citations will be to sealed, unredacted documents.

bar" in 35 U.S.C. § 102(b).[3]  *See* #245, Judge Sorokin's Order, and #254, answer to plaintiffs' amended complaint and counterclaim.[4]

RO filed a motion to compel production of documents improperly withheld as privileged. ##192, 198 (unredacted memorandum in support).  Crane opposed the motion, ##220, 221 (unredacted), and RO responded, ##225, 243-3 (unredacted).  Judge Sorokin referred the motion to this court on August 29, 2016. #246.  On October 31, this court held a hearing on the motion and after argument ordered the parties to confer and Crane to revise its privilege log. #261.  On December 1, 2016 this court held a telephone conference and ordered Crane to file the revised log and copies of the documents still in dispute for *ex parte* review, and the parties to file any post-hearing memoranda, by December 19, which they did.  ##269, 276, 276-1 (unredacted), 278, 278-1 (unredacted).   Then the parties filed replies. ##283, 285, 289 (unredacted).  On January 9, 2017, the court held a telephone conference at which the court sought to clarify which documents RO was disputing; asked Crane to provide certain additional documents; and asked Crane to provide additional declarations regarding certain documents.[5] #290.  Crane provided the requested documents and declarations.  ##291-94.  The parties filed letters with the court

---

[3]35 U.S.C. § 102(b) provides that the PTO will deny a patent to an inventor who applies for the patent more than one year after making an attempt to profit from his invention by putting it on sale.  *Merck & Cie v. Watson Laboratories, Inc.*, 822 F.3d 1347, 1350-51 (Fed. Cir. 2016).

[4]RO stated that it expected the withheld documents would support its inequitable conduct counterclaim, which "asserts that two of the named inventors at Nanoventions, and two executives at Crane, and their patent lawyer, were aware of and concealed" the fact that the patents were invalid under the on-sale bar, 35 U.S.C. § 102. #278-1 at 2-3. The court found nothing in the withheld documents that reveals that anyone was aware of this alleged issue.

[5]At the telephone conference on January 9 the court stated that it had read the hundreds of challenged documents listed in RO's filing #278-1, and since it appeared that the privilege log accurately described those documents, the court would not read every challenged document.  In the end, however, in preparing this Order, the court did read all of the documents.

concerning the telephone conference. ##297, 298. On January 30, 2017, the court ordered Crane

to further justify its claim of privilege as to certain documents and on February 2, Crane

responded *ex parte*. ## 299-301.[6]

## II. Factual background

In August 2002 Crane entered into a Confidentiality Agreement with NV, because Crane

was interested in using NV's optical system as a security device on currency. *See* #222-1. NV

had not patented the technology at that time. Thereafter, the parties entered into the following

additional agreements: in September 2003, Crane and NV entered into a Non-Disclosure

Agreement in order to negotiate Crane's obtaining a license to use NV's technology, #222-3; in

April 2004, they entered into a License Agreement in which NV granted Crane a license to use

the technology, which by that time had been patented, #222-2; in September 2007, they entered

into another Non-Disclosure Agreement, #222-4; and in September 2008 they signed a Unit

Purchase Agreement, which finalized Crane's purchase of the patents-in-suit, effectuated

through Crane's aquiring a subsidiary of NV, Visual Physics. #222-7.

When executives at Crane first became interested in NV's technology, they were

concerned that it was not protected by a patent. *See, e.g.*, #183-38 (Crane executive explains in

email dated October 28, 2003 that he and patent counsel for Crane "are zeroing in on the IP right

now since almost nothing is more important than that.") Crane began to investigate licensing or

acquiring NV's technology, *see* #276-1 at 7, and began exchanging legal advice with NV

concerning acquiring patents on the technology. *See, e.g.*, privilege log nos. 37-47 (emails dated

---

[6]In Crane's *ex parte* response it satisfactorily answered the court's questions and asserted
that it would provide certain redacted documents to RO.

November 2003, between patent counsel for Crane, Mary Bonzagni, patent counsel for NV, Todd Deveau, and the inventor of the technology, Richard Steenblik, concerning patent prosecution.) Over the next several years Crane continued to cooperate with NV concerning further patenting the technology and eventually, after negotiating with NV for many months, purchased the intellectual property from NV in 2008. ##276-1 at 7; 279-2 at 2.

RO challenges approximately 600 entries on Crane's privilege log totaling about 4,000 pages of privileged documents.[7] ##276-1 at 1; 283 at 2 n.1. The documents can be divided into four categories. First, there are documents dated before April 16, 2004, which is when the License Agreement between Crane and NV took effect. #278-1 at 14. Second, RO seeks documents between Crane and NV from the time of the License Agreement in April 2004, up to the time Crane agreed to purchase the patents-in-suit in 2008. *Id.* at 15. Third, RO seeks communications between Crane and an investment banking firm that Crane retained to assist with the acquisition of the patents-in-suit. *Id*. at 16. Finally, RO seeks documents that Crane shared with non-parties; communications between non-attorneys; and attorneys' memoranda to the file. *Id*. at 17-20.

The court has read all of the challenged documents and the privilege log. The court finds that all of the documents are privileged, for the reasons set out below.

III. <u>The law pertaining to privilege</u>

---

[7]RO requested documents, among others, concerning the subject matter of the patents-in-suit; the conception of the claimed inventions; documents authored or sent by the inventors, Richard Steenblik and Mark Hurt; prior art; documents concerning the prosecution of the patents-in-suit; definitions of claim terms; the first sale, public use or public disclosure of any patented product; and licensing of the patents-in-suit. #198 at 13-14. Crane argues only that the withheld documents are privileged; Crane does not argue that they are not relevant.

Fed. R. Civ. P. 26(b)(1) provides that parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."   Plaintiffs assert attorney-client privilege and also argue that the community of interest exception to third-party waiver applies to certain challenged documents.  Plaintiffs bear the burden of establishing that the privilege applies.  *State of Maine v. United States Dep't of the Interior*, 298 F.3d 60, 71 (1st Cir. 2002).  "If the privilege is established and the question becomes whether an exception to it obtains, the devoir of persuasion shifts to the proponent of the exception."  *FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000).

While this is a patent case, the issues raised here pertaining to privilege and waiver are not unique to patent law and thus First Circuit law concerning privilege applies.[8]  *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 804 (Fed. Cir. 2000) (because issue whether "licensor and a licensee are joint clients for purposes of privilege under the community of interest doctrine...[is] not unique to patent law," regional circuit law applies).

A.  Attorney-client privilege - in general

Wigmore set out the elements of the attorney-client privilege:

'(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser (8) except the protection be waived.'

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002) (quoting 8 J. H. Wigmore, *Evidence*

---

[8]The Federal Circuit applies "regional circuit law to procedural questions that are not themselves substantive patent law issues so long as they do not (1) pertain to patent law, ... (2) bear an essential relationship to matters committed to our exclusive control by statute, or (3) clearly implicate the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction...".  *GFI, Inc. v. Franklin Corp*, 265 F.3d 1268, 1272 (Fed. Cir. 2001) (internal citations omitted).

§ 2292, at 554 (McNaughton rev. 1961)).  The privilege is limited in that it "applies only to the extent necessary to achieve its underlying goal of ensuring effective representation between lawyer and client."  *In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.),* 274 F.3d 563, 571 (1ˢᵗ Cir. 2001) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)); *see also In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1ˢᵗ Cir. 2003) (attorney-client privilege is narrowly construed because it "stands as an obstacle of sorts to the search for truth").

Communications must "have been intended to be confidential and made for the purpose of giving or obtaining legal advice" to qualify as privileged.  *Cavallaro,* 284 F.3d at 245.  Disclosing attorney-client communications to a third party undermines the privilege.  *Id*. at 247.

B.  The common-interest doctrine

The common-interest doctrine, which is not an independent privilege but is an exception to the rule that the attorney-client privilege is waived when privileged information is disclosed to a third party, applies when parties share a substantially identical interest in the subject matter of a legal communication.[9]  *See Cavallaro,* 284 F.3d at 249-50, citing *In re Grand Jury Subpoena*, 274 F.3d 563, 573 (1ˢᵗ Cir. 2001).  One application of the doctrine as it pertains to patent cases is discussed in the leading case *In re Regents of the Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996).  In *Regents*, the Federal Circuit explained that  "[c]onsultation with counsel during

_____

[9]This exception to the waiver rule goes by many names, *see, e.g.*, *Hilsinger v. Eyeego, LLC*, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015).  For the sake of consistency the court here will refer to the "common-interest doctrine," a term which the court in *Cavallaro* applied to a situation concerning multiple parties with different attorneys, *see* 284 F.3d at 249. The First Circuit there acknowledged that the nomenclature was less important than the analysis ("[w]hether one refers to ... 'common interest,' 'joint defense,' 'joint client,' or 'allied lawyer' doctrines does not change the outcome of this case...") *Id*. at 250.

patent prosecution meets the criteria of compliance with law and meeting legal requirements, thereby reducing or avoiding litigation, and is within the scope of subject matter that is subject to the attorney-client privilege." *Id*. at 1391. The court noted that it had long been held that "'[a] community of legal interests may arise between parties jointly developing patents; they have a common legal interest in developing the patents to obtain greatest protection and in exploiting the patents.'" *Id.* at 1389 (quoting *Baxter Travenol Labs, Inc. v. Abbott Labs.,* 1987 WL 12919, at *1 (N.D. Ill. June 19, 1987)) and (citing *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 514 (D. Conn. Feb. 4, 1976) ("Whether the legal advice was focused on pending litigation or on developing a patent program that would afford maximum protection, the privilege should not be denied when the common interest is clear"), *appeal dismissed*, 534 F.2d 1031 (2nd Cir. 1976)).

The *Regents* court, following this precedent, held that communications between a potential licensee and an inventor/patentee were privileged under the common-interest doctrine because "both parties had the same interest in obtaining strong and enforceable patents." 101 F.3d at 1390. It did not matter that one party had not retained the other party's attorney: "the issue is not who employed the attorney, but whether the attorney was acting in a professional relationship to the person asserting the privilege." The court concluded that "the legal interest [between the potential licensee and the inventor/patentee] was substantially identical because of the potentially and ultimately exclusive nature" of the license agreement: "Valid and enforceable patents" on the inventions "are in the interest of both parties." *Id*.

The test for application of the doctrine requires that the interest be "identical, not similar, and be legal, not solely commercial." *Id*. With regard to what "legal interest" means in the context of patent cases, other courts have followed *Regents* in finding that communications

concerning the strength and enforceability of patents between parties who are negotiating exclusive patent licenses are protected under the common-interest doctrine, even though the communications obviously have a commercial purpose, as well. *Regents,* 101 F.3d at 1390 (quoting *Duplan Corp.v. Deering Milliken, Inc.,* 397 F. Supp. 1146, 1172 (D.S.C. 1974) ("The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest")); *Hilsinger v. Eyeego, LLC*, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015) (approvingly citing *Regents* for the proposition that communications between parties negotiating licensing agreement were privileged as they were pursuing common legal strategy concerning enforcement of patents-in-suit); *Luminara Worldwide, LLC v. Liown Electronics Co., Ltd.*, Case No. 0:14-cv-03103-SRN-FLN, ECF No. 427, at 15-18 (D. Minn. Mar. 29, 2016) (interests in obtaining and protecting strong and enforceable patent rights are regularly found to be common legal interests held by a patentee and its licensee and communications in further of those interests are protected by the community of interest doctrine); *MPT, Inc. v. Marathon Labels, Inc.*, 2006 WL 314435, at *7 (N.D. Ohio Feb. 9, 2006) (licensee and patent owners have common legal interest).

     C.  The doctrine of *United States v. Kovel*

     Another exception to the rule that disclosing attorney-client communications to a third party destroys the privilege is when an expert, such as an accountant or, as in this case, an investment banker, is employed to assist a lawyer in rendering legal advice. In *Cavallaro,* 284 F.3d at 247, the First Circuit approvingly cited *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961), where the Second Circuit applied the exception to communications involving an accountant who was assisting an attorney in preparing a client's case. In *Kovel*, the court found

that since "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others," the attorney-client privilege includes persons who act as attorneys' agents. *Id.*

The court in *Cavallaro,* however, stressed that the third-party's assistance must be nearly indispensable or serve some specialized purpose in facilitating attorney-client communications. *Cavallaro,* 284 F.3d at 249; *see Dahl v. Bain Capital Partners,* 714 F. Supp. 2d 225, 227-28 (D. Mass. 2010) (third-party's assistance must be "nearly indispensable," must "play an interpretive role," and must be made for purpose of rendering legal advice); *Conway v. Licata*, 104 F. Supp. 3d 104, 125 (D. Mass. 2015) (Sorokin, J.) (community of interest doctrine did not protect communications where third party merely "introduced" plaintiffs to counsel and "assisted" in conversations with counsel and negotiations, and no showing was made that his assistance was "nearly indispensable").

## IV.  The disputed documents

### A.  Pre-April 16, 2004 communications between Crane and NV

The first group of documents at issue are those that pre-date the April 2004 Licensing Agreement between Crane and NV. *See* privilege log at 1-12. Many of the communications are between inventor Richard Steenblik and NV's patent counsel, Todd Deveau, between Mr. Steenblick and patent counsel for Crane, Mary Bonzagni, or between the two attorneys.  All of the communications consist of requests for, discussion of, or the provision of legal advice pertaining to patent prosecution.  RO argues, among other things, that documents between Crane and NV are not privileged because they did not have any confidentiality agreement, "written or otherwise,"  in place that protected communications concerning patents, nor did Crane and NV

have a common legal interest in the patents in question.  #243 at 1-2.[10]

First, certain of the communications are between Mr. Steenblik and counsel for NV during the time when Mr. Steenblik and NV were applying for patents for his inventions, *see, e.g.*, privilege log nos. 1-6.  These clearly are protected by the attorney-client privilege.  *See In re Spalding Sports Worldwide, Inc*., 203 F.3d at 805–06 (invention record, provided to attorney "for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding," constitutes privileged communication).  These documents, which date from 2003 to 2005, were obtained by Crane when it purchased the patents-in-suit from NV, by acquiring Visual Physics, in 2008.  *See* #292 at 1-2, Declaration of John Kittredge, and accompanying list of documents.  This court is unaware of any law, and RO does not cite any, that when one company purchases another, the files that it inherits in which an inventor and counsel for the acquired company were working together to apply for a patent somehow lose their privilege.  These documents are privileged and shall not be disclosed.

The rest of the documents in this category are dated beginning in October 2003. *See* privilege log at 3.  The court rejects RO's argument that during this time the parties did not have any agreement that information shared concerning patents would be confidential.  In August 2002, approximately a year before any of the communications at issue were made,  NV and Crane entered into a mutual Confidentiality Agreement for the purpose of "discussing and exploring business opportunities related to security thread for banknote paper."  #222-1.  The

---

[10]The privilege log also lists documents dated after the License Agreement in 2004 that are between Crane and NV and relate to prosecution of patents, *see, e.g.*, privilege log at 13-17. These documents, regardless of their date, are privileged for the reasons set out in this section of the Order.

Confidentiality Agreement protected both sides' information. Its term was two years, so it expired in August 2004. *Id*. at ¶¶ 1-2, 12. RO argues that the 2002 Confidentiality Agreement "says nothing about patents" and so "had nothing to do with the sharing of privileged communications regarding patent prosecution." #243 at 1. However, by November 2003, just after the starting date of the documents RO of which seeks to compel disclosure, the parties exchanged a draft License Agreement, #222-5, so there is no question that at the time of the communications at issue, Crane and NV had an expectation that their communications would be confidential and Crane, seeking to license NV's technology for use on currency, had a keen interest in the strength and enforceability of NV's patents. In addition, a review of the documents in question leaves no doubt that the parties were working together to draft patent claims that protected their mutual interests. Further, it is obvious, given the tenor of the parties' communications, that they considered these communications to be confidential. *See, e.g.*, privilege log no. 64, email dated November 20, 2003, from NV's patent counsel to Crane's patent counsel, copying the inventors and CEO Martin of NV, providing legal advice and requesting legal advice about patent prosecution.

The License Agreement, which the parties were negotiating at the time of the communications in question, provided that Crane would have an exclusive license with regard "to the Field," #222-2 at 4, which was defined as "security thread in government-issued paper currency." *Id.* at 2 ("This license is exclusive as to the Field."). Crane and NV were bound to "cooperate with each other regarding the prosecution of patent cases and shall take all reasonable steps necessary to maintain the patent and other Intellectual Property Rights" concerning the technology at issue. *Id*. at 16. Crane and NV were required to notify each other of infringement,

to meet concerning it, and to decide the best course of legal action to protect their shared interests. *Id*. at 17.

RO argues that the License Agreement was not "exclusive" because Crane's license was limited to the field of security threads on currency as defined in the Agreement, and further argues that negotiations preceding the April 2004 License Agreement are not privileged. #278-1 at 1-3. Both arguments fail. It is clear, first, as discussed above, that communications between parties concerning the strength and enforceability of patents as they are negotiating exclusive license agreements are protected under the common-interest doctrine. *Regents,* 101 F.3d at 1390; *see also Luminara, supra* at 15-18 (citing cases). Second, the fact that an agreement is limited to a specific field, even a "narrow" one, does not vitiate the privilege. *See Hilsinger*, *supra* at *4; *Baxter Travenol Labs.,* 1987 WL 12919, at *2 (community of interest doctrine upheld between potential exclusive licensee and licensor where eventual license agreement was for limited field).[11]

RO argues that the lack of a common legal interest between Crane and NV is evidenced by emails that were disclosed to RO by Crane in which NV's CEO, Brian Martin, rebuffs Crane's offers to control NV's patent application process. #278-1 at 3-7. For example, in one email from the time the parties were negotiating the License Agreement, dated November 20, 2003, CEO Martin rejected a proposal from Crane that the Agreement require NV to consult with Crane about "all actions to be taken by [NV] with respect to its patents..." by saying, "[w]e handle our

_____

[11]Crane points out that its profit from the "narrow field" was over $260 million from 2005 to 2015. ##276-1 at 4 (citing exh. 4), 277-8 (unredacted).

own intellectual property." *Id.* at 4.[12]   This email does not, as RO asserts, mean that Crane and

NV had no area of common legal interest.  NV clearly had plans to utilize its technology in

applications beyond the field of currency protection, *see* ##192-11, 199-6 (unredacted) (email

from NV CEO Martin to Crane executive stating that inventors "have more than a dozen patents

and are taking all steps necessary to broadly protect our technology both inside and outside Crane

& Co.'s licensed field"), so it comes as no surprise that NV was hostile to the idea that Crane

would control *all* of its patent efforts.  The fact that the parties periodically disagreed concerning

the division of rights between them does not mean that they did not have a common interest in the

patents in question.  A review of the 34 disputed communications in this category that are listed

in RO's memorandum, #278-1 at 14, demonstrates that, despite CEO Martin's periodic

complaints concerning Crane's perceived over-reaching, NV and Crane, with input from

attorneys and executives from both sides and the inventor, were in fact seeking and receiving

confidential legal assistance from one another in prosecuting the patents that concerned Crane.[13]

Contrary to RO's suggestions, *see, e.g.,* #198 at 9, and in contrast to the tone of CEO

Martin's quoted emails, *id.* at 6-7, the disputed documents demonstrate "cooperation in fact

toward the achievement of a common [legal] objective."  *FDIC v. Ogden Corp.*, 202 F.3d at 461;

---

[12]This email and others in which Martin expressed reluctance to allow Crane to control its patent development properly were disclosed to RO by Crane, because while the common-interest doctrine protects communications regarding the enforceability of patents, it does not protect "communications relating to the parties' rights among themselves in the patents," because "[s]uch communications are not related to the parties' joint interests."  *See, e.g., Baxter Travenol Labs,* 1987 WL 12919, at *2.

[13]RO argues that *Regents* does not apply in this case because there, the party seeking to license the patent, Lilly, had the right to control the prosecution of the patents along with the owner of the patents. #278-1 at 13.  The court rejects the notion that both parties' having total control over patent prosecution is the litmus test for their having a common legal interest.

*see also North River Ins. Co. v. Columbia Cas. Co,* 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995) ("What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal"). These documents are correctly logged by Crane as communications concerning legal advice, sought from and given by attorneys, about the patent process and concerning the strength of the patents in light of the license that Crane was seeking.[14]

In short, the parties had a common legal interest that is widely recognized in the law, namely, the interest that potential licensees and patent owners have in successfully prosecuting patent applications as established in *Regents, supra,* 101 F.3d at 1390-91. During the time in question the parties were bound by a Confidentiality Agreement and were negotiating an exclusive License Agreement. The communications themselves demonstrate both that the parties were working together to develop strong patents and an expectation that the communications would be confidential. The documents are privileged and the privilege was not waived.

B. Communications from the time of the License Agreement in April 2004 to the time Crane agreed to purchase the patents-in-suit in 2008

RO argues that communications between Crane and NV negotiating the acquisition of the patents, including "due diligence communications and documents," are not privileged, because Crane and NV were negotiating at arms' length, and so did not have a common legal interest. #278-1 at 15-16.

Communications between NV and Crane in furtherance of Crane's purchase of the

---

[14]Another reason RO argues that Crane and NV did not cooperate in prosecuting the patents is that in a deposition, a retired Crane employee, who is not a lawyer, said that Crane did not share legal advice concerning patents with NV. #278-1 at 6-7. The short answer to this argument is that the documents themselves belie this testimony.

patents, insofar as they concern the strength and enforcement of the patents that Crane was

seeking to purchase, are privileged. This is a common-sense application of the *Regents* holding.

*See High Point SARL v. Sprint Nextel Corp.*, 2012 WL 234024, at \*9 (D. Kan. Jan. 25, 2012)

(citing *Regents, supra*, in support of ruling that communications between seller of patents and

potential buyers were privileged under common-interest doctrine: "[a]lthough [the seller] and the

other companies had adversarial interests when they were negotiating the possible transfer of the

patents, they still had a common legal interest in the validity, enforceability and potential

infringement of the patents-in-suit"), *motion for reconsideration in part allowed on other

grounds*, 2012 WL 1580634 (D. Kan. May 4, 2012); *Hewlett-Packard v. Bausch & Lomb, Inc*., 15

F.R.D. 308, 310 (N.D. Cal. Apr. 9, 1987) (Bausch & Lomb did not waive privilege by disclosing

attorney's opinion letter concerning validity and possible infringement of patent to non-party with

whom it was attempting to negotiate the sale of a business as parties had common interest in

whether patent was valid and enforceable.).

RO cites *In re JP Morgan Chase & Co. Securities Litigation*, 2007 WL 2363311, at \*5

(N.D. Ill. Aug. 13, 2007) for the proposition that companies that are negotiating a merger cannot

have a common interest because their interests are in conflict. #278-1 at 15-16. *JP Morgan* is not

a patent case. Here, as long as the communications between buyer and seller concern the strength

and enforceability of the patents, they are primarily for a legal purpose and are protected under

the common-interest doctrine.[15]

---

[15]In support of its argument that communications between NV and Crane prior to the
acquisition are merely "due diligence" and are not privileged, RO also cites *Fed. Trade Comm'n
v. Abbvie, Inc*., 2015 WL 8623076, at \*10 (E.D. Pa. Dec. 14, 2015). #198 at 27-28. The portion
of *Abbvie* that RO cites, in which the court says that due diligence communications that are
created for business purposes and not for legal purposes are not privileged, concerns

Many of the communications in this second category are between non-attorneys. RO, citing *FTC v. Abbvie*, 2015 WL 8623076, at *3 (E.D. Pa. Dec. 14, 2015), argues that the common-interest doctrine only applies to communications between attorneys who are sharing information, while acknowledging, however, that "there is a split in authority" on this point. #198 at 23-24; #278-1 at 19. As a fallback, RO argues that even where clients with a common legal interest are discussing privileged advice among themselves, the discussion must be directly and explicitly "at the direction of counsel" in order to be privileged. *Id*. at 20.

RO disregards the realities of communications between attorneys and clients and between non-lawyers who share a common legal interest. As an initial matter, Crane rightly points out that RO's own privilege log contains numerous entries between non-lawyers for which it claims common-interest protection. *See* ##276-1 at 11; 283 at 5; 286 (list of examples from RO's privilege log). Notwithstanding RO's own failure to adhere to it, the proposed rule is simply unworkable in a case like the present one, where multiple attorneys and executives are working together, with the help of assistants who gather or communicate information for them. For example, many of the communications RO complains of, #278-1 at 19, such as privilege log nos. 320 and 604, consist of non-lawyers' sending privileged requests for information, or coordinating the delivery of legal advice, at an attorney's direction. It cannot be that these communications, simply because an assistant made them at the request of a lawyer rather than the lawyer's making them herself, are not privileged. Another communication RO complains of, #278-1 at 19, privilege log no. 203, is a communication from the CEO of Crane to the CEO of NV that consists

---

communications that the court found were not privileged to begin with. *Id*. In contrast, here, the communications are seeking or giving legal advice specifically with regard to the strength of the patents in issue.

entirely, and explicitly, of advice from Crane's patent attorney concerning the strength of the patents that NV was seeking. This is a clear effort on Crane's part to assist NV by providing legal assistance in prosecuting a patent that was in both parties' interests, and is privileged under the holding of the *Regents* case.

The court has reviewed all of the communications in this category and finds that they are either seeking or discussing legal advice.[16] The fact that communications are between non-lawyers does not per se waive the privilege. In *In re Prograf Antitrust Litigation*, 2013 WL 1868227, at *3, (D. Mass. May 3, 2013), the idea that non-lawyers could discuss or relay legal advice without copying an attorney was so uncontroversial that Judge Zobel, incorporating it into her ruling, did not even discuss it. Other courts have held the same. *See Gucci America, Inc. v. Gucci*, 2008 WL 5251989 (S.D.N.Y. Dec. 15, 2008) (if privileged information is shared between parties that have a common legal interest, "the privilege is not forfeited even though no attorney either creates or received that communication"); *INVISTA North America S.a.r.l. v. M&G USA Corp.*, 2013 WL 12171721 (D. Del. June 25, 2013) (common-interest doctrine protects communications between non-attorneys); *IBJ Whitehall Bank & Trust v. Cory & Associates, Inc.*, 1999 WL 617842, at *6-7 (N.D. Ill. Aug. 12, 1999) (attorney-client privilege exists for communications between non-lawyers: "[s]o long as the parties keep the advice within their circle of common interest, the privilege is not waived"); *McCook Metals LLC v. Alcoa Inc.*, 192 F.R.D.

---

[16]The court also finds that the communications in question were limited to those in a "need to know" position regarding attorneys' advice. *See, e.g., In re Prograf Antitrust Litigation*, 2013 WL 1868227, at *3 (D. Mass. May 3, 2013) (Judge Zobel, setting out rules for determining whether documents are privileged, holds that communications between non-attorney employees who "discuss or relay counsel's legal advice" must be in a "need to know" position "or bear some responsibility for the subject matter underlying the consultation.").

242, 255 (N.D. Ill. March 2, 2000) ("it appears implicit in present day litigation with multiple attorneys required for proper representation that attorneys must be allowed to confer with each other regarding the representation of a client on a privileged basis in the same way that clients must be able to discuss the advice of counsel amongst themselves on a privileged basis") (citations omitted).

    C. <u>Communications between Crane and an investment banking firm that pre-date Crane's acquisition of the patents-in-suit</u>

In late 2007, Crane engaged the financial services firm of Brown Brothers Harriman & Co. (BBH) to assist Crane in acquiring NV's patents.[17] The acquisition as a whole involved more than $100 million and BBH was paid $1.25 million for its services. #279-2 at 5.

Attorney James Hackett was outside counsel to Crane and provided legal advice regarding the acquisition of NV's intellectual property. In his declaration, Attorney Hackett addresses the communications in dispute that he and other attorneys from his law firm exchanged with representatives from BBH from June to September 2008 concerning the acquisition of NV's patents. He states, "I shared legal advice with Crane's advisors at BBH, in strict confidence, where it was necessary for BBH to facilitate our provision of legal advice." #279-2 at 2. The communications with BBH were in part concerning the drafting of "the agreements necessary to accomplish the acquisition." *Id*. With regard to the drafting of such documents, Attorney

_____

[17]The engagement letter states that BBH, among other things, would "advise and assist" in formulating an "effective strategy" for the transaction, assist in determining "the most advantageous financial structure for any particular Transaction," assist in negotiations concerning the transaction, and "to the extent necessary or useful, assist in coordinating the activities of other professional firms whose services may be required by [Crane], including attorneys, accountants, consultants, and others." The letter further provides that BBH would keep all of Crane's information confidential. #279-3 at 2 (engagement letter).

Hackett states:

> In drafting and negotiating the acquisition agreements, Crane required both privileged legal advice from attorneys and the expertise of BBH regarding corporate transactions, all of which needed to be coordinated to assist Crane in reaching the optimum effective agreements. The provision of the agreements necessarily related to the strategy, financial arrangements, and deal structure that BBH was required to formulate, and the agreements are legal contracts that also required legal advice to codify, so my attorney team and the team at BBH were required to share information to assist each other in giving the necessary advice to Crane.

*Id*. at 4-5.

Attorney Hackett expected that the legal advice he shared with BBH, which was similar to work he had done on other "significant corporate transactions throughout [his] career," to be confidential and privileged. *Id*. at 5.

The court here, following the holding of the First Circuit in *Cavallaro*, finds that those communications that included BBH, counsel, and Crane that were made in order to facilitate communication between Crane and its attorneys for the purpose of seeking legal advice, that were indispensable to the provision of legal advice, and that were intended to be confidential, are protected. *Cavallaro*, 284 F.3d at 246-49.

The court in *Cavallero* provided guidance for applying its general holding to particular facts. One pertinent question is whether the client actually was seeking advice from the third party, or from the attorney. *Id*. at 247. In *Cavallero*, the court questioned whether the attorney, a senior partner at Hale and Dorr with "over twenty years' experience, and a specialist in trust and estates," truly required advice from the accountant, or whether the attempt to protect the accountant's communications under the attorney-client privilege, where the parties were under investigation for tax fraud, was a subterfuge. *Id*. at 249.

In the context of this case, the question whether the client was primarily seeking advice

from BBH or from attorneys is closely related to whether the communications concern legal or business advice. That is, was BBH assisting the attorney in some critical way in giving legal advice, or was the attorney serving as a passthrough for business advice? "A key component of the privilege is that the communications with the attorney must call upon the attorney in his or her capacity as a legal advisor." *America's Growth Capital, LLC v. PFIP, LLC d/b/a Planet Fitness*, 2014 WL 1207128, at *2-3 (D. Mass. Mar. 14, 2014) (Stearns, J.) (giving of business advice and requests for such advice not protected). Of course, the difficulty in distinguishing legal from business advice is obvious and has been noted in the cases. *See America's Growth,* 2014 WL 1207128, at *3 (distinctions between legal and business matters in context of communications with in-house counsel "hard to draw") (citing *United States v. Windsor Capital Corp.*, 524 F. Supp. 2d 74, 81 (D. Mass. 2007)). Business and legal concerns often overlap, and no one would argue that when lawyers advise clients concerning business matters such as the drafting of contracts, their advice is not privileged. *See, e.g., Marusiak v. Adjustable Clamp Co.*, 2003 WL 21321311, at *2 (N.D. Ill. June 5, 2003) ("while it is true that solely personal or business advice is not protected by the attorney-client privilege, legal advice relating to business matters clearly is"); *Weeks v. Samsung Heavy Industries, Ltd.*, 1996 WL 288511, at *2 (N.D. Ill. May 30, 1996) (attorney-client privilege not vitiated simply because attorney weighs business considerations in rendering legal advice.)

Applying the criteria from *Cavallaro* here, first, there is no question that the communications were intended to be confidential: the court credits the declaration of Attorney Hackett, that the communications were made in "strict confidence," #279-2 at 5, and the emails themselves demonstrate that the parties assumed they were confidentially sharing information.

With regard to the purpose of the communications at issue, while BBH's engagement letter states only in relevant part that Crane hired BBH to "assist in coordinating the activities of other professional firms whose services may be required by [Crane], including attorneys...", the court accepts Attorney Hackett's assertion that he understood that Crane hired BBH in part to facilitate the provision of legal advice to Crane, #279-2 at 2, not only because he states it in his declaration but because the documents themselves demonstrate that Attorney Hackett in fact persistently asked BBH for help in crafting legal advice.[18] The court finds that the advice as related to the clients in the emails is legal advice, not business advice. Therefore, the communications at issue here are for the primary purpose of communicating with the attorney and not with the banker.[19]

---

[18] One typical entry, privilege log no. 1248, is an email from BBH employee John Molner to Attorney James Hackett, copying executives at Crane and others at BBH. Mr. Molner, responding to an email asking for his comments, is agreeing that something is difficult to understand and is then framing questions for the attorney about technical aspects of a proposed contract. This email is an example of the investment banker facilitating communication between Attorney Hackett and his client for the purpose of providing legal advice, by providing professional advice within his area of expertise to assist the attorney in understanding complex business issues so that he can draft a contract for his clients. Another typical email chain, privilege log nos. 1142, 1144-6, and 1171, is between Attorney Hackett to Mr. Molner and Crane executives concerning a contract, where Mr. Molner is asking to review a certain document drafted by patent attorney Mary Bonzagni in order to assist Attorney Hackett in providing advice to his client. Privilege log no. 1250 is an email from Attorney Bonzagni to Crane's President, Attorney Hackett, and Mr. Molner, asking them to review a certain draft of an agreement pertaining to the intellectual property. In other words, she is seeking BBH's input so that she may provide legal advice to her client. Another series of emails, privilege log nos. 1231-32, is between BBH representatives and Attorneys Bonzagni and Hackett, where BBH is asking for legal advice prior to reviewing certain documents. Finally, another typical email is privilege log no. 1234, where Attorney Hackett is giving legal advice and soliciting feedback on his advice from his client and from BBH after drafting a contract.

[19] After review of the documents, the court asked Crane to justify its claim of privilege for certain documents which the court deemed to be primarily business-related, and in fact, Crane either justified its claim of privilege for those documents or produced them to RO. *See* #301 (*ex parte* response by Crane) at 3-4.

With regard to the importance of BBH's role in the provision of legal advice to Crane, Attorney Hackett states that he shared legal advice with BBH where it was "necessary to accomplish" a legal purpose and that the client "required both privileged legal advice from attorneys and the expertise of BBH regarding corporate transactions." *Id*. at 2, 5. *Compare Conway*, 104 F.Supp. 3d at 125, (Judge Sorokin holds that communications involving a third party who only "introduced" plaintiffs to counsel and "assisted" in conversations with counsel and negotiations, where no showing at all was made that his assistance was "nearly indispensable,' were not protected by the attorney-client privilege.)

While the First Circuit has not decided a case directly on point, there are cases holding that in certain circumstances financial advisors are "indispensible" to the provision of legal advice. In *Stafford Trading, Inc. v. Lovely*, 2007 WL 611252, at *6, 8-12 (N.D. Ill. Feb. 22, 2007), the party asserting the privilege, like Crane in this case, had retained an investment banker to assist in facilitating an acquisition. *Id.* at *1. The court, after exhaustively reviewing the many cases for and against upholding the privilege in such a situation, held that "[m]any courts have recognized that, in today's market place, attorneys need to be able to have confidential communication with investment bankers to render adequate legal advice," and found that the privilege would hold for instances where the banker and counsel confidentially communicated for the purpose of obtaining or providing legal advice. *Id.* at *7 (citing cases); *see also Calvin Klein Trademark Trust v. Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (Rakoff, J.), (attorney communications with banker privileged because banker, functioning as an expert, advised attorney regarding whether certain information was "material" in legal sense, and so was serving "an interpretive function" for attorney).

RO cites, among other cases, *U.S. v. Ackert*, 169 F.3d 136 (2nd Cir. 1999), #198 at 22, in support of the proposition that the privilege should not apply here. In *Ackert*, an investment banker working for Goldman, Sachs approached Paramount Corporation with an investment proposal, and Paramount's tax counsel subsequently conferred with the banker about the tax implications of the proposed investment. The deal was ultimately consummated with another investment firm. Some years later, the IRS, conducting an audit of Paramount, sent a summons to the Goldman, Sachs banker seeking his testimony about the proposal. *Id.* at 138. The Second Circuit found that communications between the attorney and the banker were not privileged: "[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *Id.* at 139. The court quoted 8 Wigmore on Evidence § 2317 at 619 (McNaughton rev. ed. 1961): "'It is ... not sufficient for the attorney, in invoking the privilege, to state that the information came somehow to him while acting for the client nor that it came from some particular third person for the benefit of the client.'") *Id.* The court held that because the banker's role in that case was not strictly "to translate or interpret information given to [the attorney] by his client," the privilege was waived. *Id.* at 140.

Here, unlike in *Ackert*, where an investment banker approached a client with an unsolicited business deal, Crane specifically retained BBH to assist in a particular transaction. The information that BBH was providing cannot be said to have "somehow come to" Crane's attorneys from a third party, *compare Ackert*, 169 F. 3d at 140. BBH's participation was sought by the client, in part, to assist the attorney. It was more than merely "important," as according to Crane's attorney, BBH's advice was necessary, or required, for him to render advice to his client. Further,

unlike in *Ackert*, where the IRS was investigating the parties, the court has found no evidence here that the claim of privilege is a "subterfuge." *Cavallero*, 284 F. 3d 249.

In summary, the negotiations here concerned a substantial transaction: the acquisition of a company for over $100 million dollars. Attorney Hackett's assertion that it was necessary for him to have input from BBH in order adequately to advise his client concerning this complicated deal is credible. The court notes that Attorney Hackett states that it was his practice to collaborate confidentially with third parties such as BBH and had done so "on significant corporate transactions throughout my career." #279-2 at 5.[20] This is not a situation, such as in *Caravallo,* where even a seasoned attorney necessarily would already know all he needed to in order to do his job drafting contracts and advising his client in this matter. Nor does it appear the privilege is being claimed after the fact as a means of gaining an unfair advantage in litigation. *Compare Caravallo*, 284 F. 3d 249.

The emails including BBH are privileged and shall not be disclosed.

D. <u>Documents that Crane shared with third parties; communications between non-attorneys; and attorneys' memoranda to the file.</u>

The court has carefully reviewed all of the documents in this category and finds that they are privileged.

---

[20]Certain statements are made on the privilege log that are not in Attorney Hackett's declaration, for example, that "Nanoventions' representative in negotiations was a banker," thus suggesting that it was necessary for Crane to consult with a banker in order to negotiate the purchase of the company. *See, e.g.*, privilege log no. 1231. The court has not considered statements made in the privilege log that are not in any declaration.

## V.  Conclusion

For the reasons set out above the court finds that the documents are privileged and shall not be disclosed.


/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge